## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Vicki Jung,                                            Civil No. 14-3141 (DWF/LIB)

            Plaintiff,

v.                                                          **MEMORANDUM**
                                                    **OPINION AND ORDER**

City of Minneapolis,

            Defendant.

---

Frances E. Baillon, Esq., and Joni M. Thome, Esq., Baillon Thome Jozwiak & Wanta LLP, counsel for Plaintiff.

Brian Scott Carter, and Gregory P. Sautter, Minneapolis City Attorney's Office, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by City of Minneapolis (the "City") (Doc. No. 16), in which the City seeks summary judgment on all claims brought against it by Plaintiff Vicki Jung ("Jung"). For the reasons set forth below, the Court grants in part and denies in part the motion.

## BACKGROUND

In 1994, Jung began working for the City's Fire Department as a firefighter. (Doc. No. 23 ("Baillon Decl.") ¶ 2 ("Jung Dep.") at 29-30.) In 1999, Jung was promoted to Fire Captain. (*Id.* at 47.) In November 2003, Jung was diagnosed with leukemia. (*Id.* at 48.) After her treatment, Jung considered not returning to firefighting because her

doctor advised against it.  (*Id.*)  However, in early 2007, Jung was offered a position as a hazardous materials ("hazmat") inspector.  (*Id.* at 49.)  In January 2007, Jung was transferred from medical leave to a full time position as a staff captain hazmat inspector. (Doc. No. 18 ("Sautter Decl.") ¶ 4, Ex. 2.)

In January 2011, the Fire Prevention Bureau, which was responsible for hazmat inspections, moved from the Fire Department to the Department of Regulatory Services. (Baillon Decl. ¶ 2 ("Fruetel Dep.") at 19-20.)  Jung remained with fire administration as a Staff Captain, where she worked for Assistant Chief Cherie Penn ("Penn").  (Sautter Decl. ¶ 6, Ex. 4; Jung Dep. at 56.)   At this time, Jung performed personnel services, helped with fire inspections, and handled other miscellaneous duties.  (Sautter Decl. ¶ 6, Ex. 4; Jung Dep. at 56-57.)

On July 19, 2011, Penn noted the following about Jung's performance:

Mid-year:  Staff Captain Jung meets the requirements associated with her first responder certification.  She is expected to participate in the required training associated with the newly established firefighter licensure mandated by the state.  Captain Jung has experienced a few delays in reporting to work due to illness(es) but makes adjustments to ensure her weekly time schedule is honored.  Captain Jung has made adjustments and is still adjusting to the shift in her job responsibilities that took place on January 1, 2011. . . .  She conducts herself in a professional manner but is reminded that office etiquette (voice levels and neatness) is to be observed, to wit the neatness of her cubicle has been the subject of discussions and is still a concern.  I am confident that following this appraisal, this matter will be addressed.

(Sautter Decl. ¶ 6, Ex. 4.)

In fall 2011, Jung posted on Facebook:  "Why is the Minneapolis Fire Department working all this overtime?  Why can't they bring back some of their firefighters that we

laid off?"  (Jung Dep. at 85.)  Jung contends that both Penn and Fire Chief, Alex Jackson

("Jackson") spoke to her about her Facebook post, making it clear that they did not like it.

(*Id*. at 85.)  Jung reported Jackson's comments to Steve Kennedy ("Kennedy"), Human

Resources Investigator, and told him that she felt that she was being retaliated against.

(*Id*. at 87.)

Jung also asserts that around the same time, she learned that Penn had a

subordinate, Robert S. ("R.S."), do Penn's college homework while R.S. was at work.

(*Id*. at 88.)  Jung testified that R.S. called her "25 times" and told her he was sick of

doing Penn's homework.  (*Id*.)

On October 12, 2011, Jung e-mailed the Human Resources ("HR") director,

Pamela French ("French").  (Baillon Decl. ¶ 2, Ex. Z.)  Jung told French she had some

things to report anonymously.  (*Id*.)  Jung claimed that she could not go to her supervisors

or her own HR contact for fear of reprisal.  (*Id*.)  On October 13, 2011, Jung met with

Kennedy to complain about Jackson and Penn.  (Sautter Decl. ¶ 9, Ex. 7; Baillon Decl.

¶ 2, Ex. D.)  After the interview, Jung e-mailed Kennedy alleging that Jackson and Penn

were retaliating against her because Penn was in the office and Jackson talked to her

about her Facebook posts.  (Sautter Decl. ¶ 10, Ex. 8.)  Later that evening, on October 13,

2011, Jung lodged an anonymous complaint (the "Ethics Complaint") to the Ethics and

Compliance Employee Hotline, contending that Penn had been "misusing her power and

status by asking coworkers to do her homework."  (Sautter Decl. ¶ 11, Ex. 9.)  Jung also

stated:  "I am terrified I will be retaliated against."  (*Id*.)  The next day, Community Risk

Reduction Officer, Cassidy Anderson  wrote to Kennedy and French:  "[Jung's] fear of

retaliation is valid.  The dynamics inside MFD headquarters (233CH) are incredibly

dysfunctional, inappropriate, and unethical, to name a few."  (Baillon Decl. ¶ 2, Ex. B.)

In an e-mail dated October 21, 2011, Jackson and Penn were formally informed of

the anonymous complaint against Penn.  (Sautter Decl. ¶¶ 15, 16,  Exs. 13, 14.)  Kennedy

interviewed witnesses, including Jung, Penn, and Jackson.  (*Id.* ¶ 8, Ex. 6.)  A final report

on the Ethics Complaint was issued on November 29, 2011, finding that the ethics

allegation was not substantiated by the investigation.  (*Id.*)  When Kennedy told Jung

about the findings, Jung asked:  "Are you kidding me? What about the mayor's office,

don't they know about this?" and "Can I go talk to the mayor's office?"  To which

Kennedy responded:  "You can walk right over there right now and talk to them."  (Jung

Dep. at 143.)  Jung did so.  (*Id.*)  Jung alleges that Chief Jackson was angered by this and

shouted about it in the office.   (*Id.* at 144.)

Jung asserts that after the Ethics Complaint and investigation, Penn treated her

differently, for example by requiring Jung to verbally notify the front desk every time she

left the office to use the bathroom and demanding that Jung maintain a strict work

schedule.  (Jung Dep. at 90-92, 108-09.)

On November 14, 2011, all administrative staff began to report to Penn.  (Sautter

Decl. ¶ 13, Ex. 11.)  Shortly thereafter, Penn held a meeting of subordinate staff captains

and asked them to sign a document entitled "Administrative Staff – Expectations."  (*Id.*

¶ 14, Ex. 12.)  Jung signed this document.  *Id*.  The document included directives on

timeliness, absences, dress, tidiness, and work-place etiquette.  (*Id.*)

On January 6, 2012, Penn directed Jung to attend an 8:00 a.m. staff meeting.

(Sautter Decl. ¶ 18, Ex. 16.)  Jung did not attend, as she did not arrive until 8:30 a.m. (which Jung claims was her normal start time).  (*Id*.)   Jung was asked to meet with Penn and Human Resources Generalist Beth Toal ("Toal"), at which time Penn and Toal presented Jung with a document entitled "Expectations" dated January 6, 2012.  (Baillon Decl. ¶ 2, Ex. H.)  This document addressed topics such as appropriate written and verbal communications over the telephone, management of confidential information, and the restriction of "house calls."  (*Id*.)  Jung refused to sign the document.  (*Id*.)

On January 10, 2012, Jung initiated a retaliation complaint, alleging that Penn was retaliating against her for lodging the Ethics Complaint.  (Baillon Decl. ¶ 2, Exs. G & I.) Jung claims that Penn had increased surveillance of her at work:

> Well, when they amped up their surveillance, it was like you had to be at work – when I started downtown, you could be to work any time you wanted as long as you did your eight hours, you could just go home.  You could break it up, you could do four here and four there.
>
> [Penn] made it very clear to me that I no longer had that.  She was like, "You'll be here every day at this time."  Because she's the assistant chief at that time.

(Jung Dep. at 88-89.)  On January 13, 2012, Kennedy interviewed Jung about her complaint, during which Jung reported, among other things, that:  Penn forced Jung to change her long-standing work schedule; Penn refused to acknowledge Jung's contribution of extra duties in HR; Penn scheduled mandatory meetings outside of Jung's normal working hours but did not allow overtime; Penn disciplined Jung on January 6, 2012 with the "Expectations" letter; Penn intensified surveillance of Jung's

work activities; and Penn excluded Jung from an administrative meeting.  (Baillon Decl. ¶ 2, Ex. I.)

From January 21, 2012 to May 2012, Jung took a leave of absence to pursue counseling and therapy to cope with the alleged workplace hostility.  (Jung Dep. at 83.) Jung was diagnosed with PTSD, depression, and anxiety.  (*Id*. at 99-100.)

On February 8, 2012, the investigator released a report on Jung's January 10, 2012 complaint of retaliation and hostile work environment, finding that Jung's allegations were not substantiated by the investigation.  (Baillon Decl. ¶ 2, Ex. I.)

Jung returned to work in May 2012, and was assigned to work under Fire Marshall Perry Ebner ("Ebner").  (Jung Dep. at 100-01.)  Jung maintains that during this time, Penn remained in Jung's chain of command and continued to scrutinize her work performance and attendance in a retaliatory fashion.  In particular, Jung claims that Penn told Ebner that Jung was too loud and inquired about Jung's workplace activities and hours.  (*Id*. at 105.)   Jung asserts that she reported the alleged retaliation to Ebner.  (*Id*.) Jung also asserts that Ebner began to monitor her closely.  Jung contends this was in response to her reporting to Ebner that Penn was continuing to retaliate.  (Jung Dep. at 105.)  Ebner spoke to Jung on several occasions in June 2012 about attendance and timeliness.  (Sautter Decl. ¶ 19, Ex. 17.)  On June 27, 2012, Jung was issued a written warning for being absent without leave ("AWOL").  (*Id*.)

On September 28, 2012, Jung e-mailed Ebner, complaining about Penn and continued alleged surveillance and indicating that she might file a formal complaint. (Sautter Decl. ¶ 27, Ex. 25.)  Jung later e-mailed Ebner, claiming that Penn had instructed

her not to attend a training session.  (*Id.* ¶ 28, Ex. 26.)  Penn denies that she told Jung or

anyone else not to attend the training.  (Doc. No. 19 ("Penn Decl.") ¶ 7.)

On November 8, 2012, Jung e-mailed Ebner, complaining of discrimination

against her and others related to overtime availability, along with continuing complaints

of retaliation.  (Sautter Decl. ¶ 20, Ex. 18.)  Around the same time, Jung injured her back

at work while filing.  (Jung Dep. at 153-54.)  Jung filed a workers' compensation claim.

(*Id.*)  According to Jung, when she told Ebner, he remarked:  "Really?  You hurt your

back filing . . . That's ridiculous."  (*Id.*)

On February 11, 2013, Jung received her performance review for 2012, which was

given by Ebner.  (Sautter Decl. ¶ 21, Ex. 19.)  The review gave "unsatisfactory" ratings

for dependability/reliability in performing her assigned duties and for understanding and

complying with orders as directed.  (*Id.*)  Ebner commented:

> Staff Captain Jung late on more than one occasion to work during the time
> period of June 19-28, 2012.  She also was absent from work prior to her
> shift ending.  It was documented and she was given a written warning
> through the proper channels.  Captain Jung performs many of the job
> functions as required.  She currently does re-inspections and inspections as
> assigned.  Captain Jung has not completed the required eight inspections
> per day as stated in MFD policy.  She was told earlier in the year that she
> just had to do five per day.  She has not met that minimum amount as
> directed.  She completed a total of 99 inspections for the entire year of
> 2012.

(*Id.*)

On February 21, 2013, Ebner informed Jung that she and three others (including

Ebner) were to be relocated to the Public Service Center ("PSC") on February 27, 2013.

(Sautter Decl. ¶ 30, Ex. 28.)  Jung responded that she could not relocate from City Hall

because she needed to be close to a restroom and the PSC was too loud.  (*Id.*)  Jung

asserts that this was a request for an accommodation.  The parties dispute whether an

interactive process was initiated, but in any event, Jung's relocation was cancelled and

she remained at City Hall.  (Sautter Decl. ¶ 30, Ex. 28; Jung Dep. at 209.)

On March 3, 2013, Jung e-mailed Kennedy and indicated that she was "ready to

make a formal charge and or complaint of harassment and discrimination."  (Sautter

Decl. ¶ 23, Ex. 21 at MPLS002762.)  On April 19, 2013, Jung withdrew her complaint.

(*Id.* ¶ 25, Ex. 22.)

On March 13, 2013, Ebner informed Jung that she would likely be reassigned

when the inspections she was assisting with were complete. (Sautter Decl. ¶ 25, Ex. 23.)[1]

In his initial communication, Ebner explained:

> The Minneapolis Fire Department has 150 re-inspections or less
> outstanding to date.  Both you and Captain Pierzina are continuing to do
> these inspections.  Captain Pierzina anticipates them being complete within
> one month or less with a few outstanding.  About two weeks ago I reported
> this information to Chief Fruetel per his request for an update.
>
> Based on this information, MFD will no longer have a need for an inspector
> to do the re-inspections since they no longer exist.  As you are aware, all
> inspections (commercial and residential) have been reassigned to
> Regulatory Services, Fire Inspection Services per the direction of the City
> Coordinator and the Mayor.  In light of all the said changes, Chief Fruetel
> will be reassigning you in the very near future for the better of the
> department to a different position once the re-inspections are more or less
> done.

---

[1]     In 2012, Chief John Fruetel ("Fruetel") told Jung that she may be returned to fire
suppression because of the elimination of her hazmat position.  (Sautter Decl. ¶ 29,
Ex. 27 at MPLS002422.)

(*Id.*)  Ebner later followed up to note that a final decision had not been made on her

reassignment.  (*Id.*)

Jung asserts that from April to August 2013, she was excluded from Fire

Education training exercises, and that when she asked about it, an HR representative told

her it was because "We don't think you're fit for duty."  (Jung Dep. at 140.)  On

April 18, 2013, Ebner wrote to Fruetel:

> I am having great difficulty with Captain Jung keeping appointments for
> scheduled events.  One of the main reasons is she has been frequently
> reporting off ill from work.  Today is no exception.  She has reported off
> four times in the past two weeks since you reassigned her to this position.
>
> Chief, even though she has no apparent work limitations according to
> Captain Kawaters, I am not sure she is fit for duty.  Her physical ailments
> seem to stem from an injury of some type.  My other main concern is
> previous emails sent to me and others within the department from Captain
> Jung expressing her need to be by a window, close to a bathroom and to
> work in a quiet environment.  Again, there are no noted limitations on her
> workability that I know of, but her requests are not being met knowing she
> is now in a job that requires her to possibly be in front of large crowds,
> classrooms full of young children and other presentations in facilities that
> might not accommodate her needs. . . .

(Baillon Decl. ¶ 2, Ex .L.)

On July 1, 2013, Jung reported that someone was unlawfully accessing her e-mail

when she was not at her desk.  (Jung Dep. at 183; Sautter Decl. ¶ 32, Ex. 30.) Personnel

from Information Technology ("IT") recommended that Jung practice better computer

and password security.  (*Id.*)  On July 29, 2013, Ebner discovered that Jung left her

computer unattended and unlocked.  (Sautter Decl. ¶ 33, Ex. 31.)  Ebner e-mailed Jung to

remind her of computer security responsibilities.  (*Id.*)  Jung claims that Ebner mocked

her and called other employees to view her open, unlocked computer.  On the same day, Jung reported to Kennedy and Toal that Jung was being retaliated against for reporting the Internet security breach and complained again about harassment and discrimination based on her protected status.  (Baillon Decl. ¶ 2, Ex. N.)

On August 1, 2013, Fruetel met with Ebner and Jung to inform Jung that she would be transferred to fire suppression.  (Sautter Decl. ¶ 35, Ex. 33.)  The discussion was memorialized in a letter.  (*Id*. ¶ 36, Ex. 34.)[2]  The letter explained:  "This action is being taken because of the reorganization of Fire Inspection Services to the Department of Regulatory Services and the subsequent elimination of your position as the Hazardous Materials Inspector."  (*Id*.)  Fruetel testified that he moved Jung back to the station because her position at hazmat was eliminated on January 1, 2011, and because her work in inspections was substantially completed.  (Fruetel Dep. at 61-63.)  Fruetel also maintains that he was unaware of Jung's July 29, 2013 complaint at the time he decided to transfer Jung.  (Doc. No. 20 ("Fruetel Decl.") ¶ 3.)[3]  There is record evidence that Fruetel conferred with Penn, who received a copy of Jung's July 29 report of retaliation, before deciding to transfer Jung.  (Fruetel Dep. at 63-64.)

Jung asserts that her transfer back to the station was actually a demotion and that she was not permitted to have union representation at the meeting.  Jung also asserts that

---

[2]      The parties agree that the dates referenced in the letter are incorrect, and that it was signed after the August 1, 2013 meeting.

[3]      Jung points out that at his deposition, Fruetel testified that he did not recall that Jung had complained.   (Fruetel Dep. at 80.)

the transfer resulted in a reduction in her hourly pay and an unfavorable restructure of her work schedule. For example, Jung asserts that her hourly wages decreased from $42.16 per hour to $29.84 per hour. (Baillon Decl. ¶ 2, Ex. AH at Answer 7.) In addition, Jung asserts that she was required to work more hours per year, and some 24-hour shifts. (*Id*.; Jung Dep. at 224.) Defendants point to evidence that, due to increases in overtime availability, Jung's annual income increased from $88,812.92 in 2011, to $89,003.61 in 2012, $97,250.32 in 2013, and $121,265.90 in 2014. (Sautter Decl. ¶ 43, Ex. 41 at Answer 19.)

All sworn firefighters must be fit for duty, regardless of assignment. (*Id*. ¶ 37, Ex. 35 ("Labor Agreement") at Art. 23; Fruetel Dep. at 31.) In an interview conducted by HR Investigator Elizabeth Adeniyi ("Adeniyi"), Jung agreed that she was fit for duty to work fire suppression. (Sautter Decl. ¶ 39, Ex. 37.) When Jung returned to work after receiving treatment for leukemia, Jung was deemed fit for duty, including fire suppression. (*Id*. ¶ 38, Ex. 36.) Fruetel testified that he did not question Jung's fitness, only her performance:

> I never questioned the fitness for duty issue. This is more about a performance issue than it was fitness of duty, that there was a demonstration of an inconsistent level of performance and I never determined that to consider that a fitness for duty scenario.

(Fruetel Dep. at 71.)

On August 16, 2013, Jung reported to Kennedy that she was being treated in a retaliatory and discriminatory manner, and she sought accommodation:

> I believe some laws have been broken. It is because I have a disability status and because of possible protected other status[es] as well so that is

blatant discrimination.  No one else gets treated with such disregard in the
office environment at city hall.

(Baillon Decl ¶ 2, Ex. R. at MPLS002719.)[4]  On August 26, 2013, Jung and two other

employees (who were returning to work after back injuries) were made to endure training

in extreme heat, and the training was eventually cancelled because of the heat.  (Jung

Dep. at 210-11.)

On October 10, 2013, Jung was interviewed regarding her August 16, 2013 report.

(Baillon Decl. ¶ 2, Ex. V.)  Ultimately, and not until August 2014, Adeniyi concluded

that evidence did not support a conclusion that Jung was treated differently, discriminated

against, harassed, or retaliated against by Ebner.  (*Id.*)  Jung asserts that the City

continued to retaliate against her in various ways.

Jung worked as a firefighter until January 2015, at which time she took a leave of

absence after injuring her back at work.  (Jung Dep. at 75.)  Jung received worker's

compensation benefits until August 8, 2015.  (*Id.* ¶¶ 6-7.)  Jung is now on medical leave

without pay.  (*Id.*)

On July 24, 2014, Jung filed the present action in state court.  (Doc. No. 1, Ex. 1

("Compl.").)  The City removed the action to this Court on August 12, 2014.  (Doc.

No. 1.)  In this action, Jung asserts four causes of action:  (1) Violations of the Minnesota

Whistleblower Act (Count I); (2) Disability Discrimination/Hostile Work Environment in

---

[4]     In that complaint, Jung claims in early August, 2013, she repeatedly attempted to
find out when she was to report to training and made herself available, but that no one
told her where to report, and that on August 13, 2013, she was classified as AWOL for
failing to report.  (Baillon Decl. ¶ 2, Ex. R.)  This was later rescinded.  (*Id.*)

Violation of the Minnesota Human Rights Act ("MHRA") (Count II); (3) Violation of the

MHRA (Discriminatory Retaliation) (Count III); and (4) Deprivation of Civil Rights

Under Color of Law, 42 U.S.C. § 1983 (Count IV).  (Compl.)  The City moves for

summary judgment on all claims.

## DISCUSSION

### I.     Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*,

92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in

the record that create a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986).

## II.      Disability Discrimination under the MHRA

In Count II of the Complaint, Jung claims that the City discriminated against her in violation of the MHRA.  The MHRA prohibits employers from making adverse employment decisions against an employee on the basis of the employee's disability. Minn. Stat. § 363A.08, subd. 2.  An employer also violates the MHRA by failing to reasonably accommodate "the known disability of a qualified disabled person."  *Id*. § 363A.08, subd. 6(a).  Employment discrimination can be established under theories of disparate treatment or disparate impact.  *Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 982 (2014).  Jung asserts claims under both.

Claims arising under the MHRA are considered under the same analysis as claims arising under the Americans with Disabilities Act ("ADA").  *See Kobus v. College of St. Scholastica, Inc*., 608 F.3d 1034, 1038 (8th Cir. 2010); *see also Kammueller v. Loomis, Fargo & Co*., 383 F.3d 779, 784 (8th Cir. 2004).

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *See Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010); *Dovenmuehler v. St. Cloud Hosp*., 509 F.3d 435, 439 & n.4 (8th Cir. 2007).  Under *McDonnell Douglas*, Jung must first establish a prima facie case of discrimination.  *Dovenmuehler*, 509 F.3d at 439.  The burden then shifts to the City to articulate a legitimate, nondiscriminatory reason for its actions.  *Id*. Finally, Jung must show that the City's proffered reason was a pretext for discrimination. *Id*.

14

### A.     Statute of Limitations

As a threshold matter, the City asserts that most of Jung's MHRA claims are time

barred.  A civil action of an unfair discriminatory practice under the MHRA must be

brought "within one year after the occurrence" of the act of discrimination or retaliation.

Minn. Stat. § 363A.28, subd. 3.[5]  Jung served the present Complaint on the City on

July 24, 2014.  (Compl.)  The City argues that any allegedly discriminatory actions that

occurred prior to July 24, 2013 are therefore untimely.  Jung does not dispute this and, in

her opposition, focuses solely on her transfer to fire suppression and the changes to her

work environment post-transfer to support her MHRA claims.  Because Jung does not

rely on any alleged actions prior to July 2013, the Court need not decide the statute of

limitations issue.

### B.     Prima Facie Case

To establish a prima facie case of disability discrimination, a plaintiff must show

that she:  (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action

due to her disability.  *See Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930

(8th Cir. 2012).

### 1.     Disability

Under the MHRA, a "disability" is "any condition or characteristic that renders a

person a disabled person."  Minn. Stat. § 363A.03, subd. 12.  Jung asserts that she has a

---

[5]     Jung could have brought a civil action or filed a charge with the commissioner within one year of the alleged violation.  *See* Minn. Stat. §§ 363A.28, subd. 1 & 3.

history of cancer/compromised immune system, depression, anxiety, and PTSD.  The

City agrees, for the purposes of this motion only, that a cancer diagnosis can support a

claim for disability under the MHRA.  Therefore, Jung satisfies the first prong of her

prima facie case.

## 2.    Qualified

Whether an individual is qualified within the meaning of the ADA is determined

by applying a two-part test:  (1) whether the individual possesses the requisite skills,

education, certification or experience necessary for the job; and (2) whether the

individual can perform the essential functions of the job with or without reasonable

accommodation.  *See Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015)

(citations omitted).)  Jung asserts that she was qualified for her job in administration "and

other jobs at Defendant."  (Doc. No. 22 at 29.)   The City contends that Jung was, indeed,

fit for duty as a firefighter.  Therefore, viewing the record in the light most favorable to

Jung, the Court concludes that Jung has satisfied the qualified prong of her prima facie

case.[6]

---

[6]      The City has pointed to evidence that fitness for duty is an essential job function
for a sworn firefighter under the applicable Labor Agreement.  (Labor Agreement
§ 23.1.)  Jung contends that before she was transferred, Ebner linked his dissatisfaction
with her performance to her disabilities and claimed that Jung was not fit for duty in fire
suppression.  The City argues that this position is contradictory because if Jung was not
fit for duty, she would have been unable to conduct the essential functions of the job and
therefore would not be "qualified."  The Court agrees that Jung's position is
contradictory, but nonetheless finds that she has established this prong of her prima facie
case.

### 3.    Adverse Employment Action

The third prong of a prima facie case of discrimination requires Jung to show that she suffered an adverse employment action on the basis of her disability.

> An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard.

*Cooney v. Union Pac. R. Co.*, 258 F.3d 731, 734 (8th Cir. 2001) (citations omitted).  Jung asserts that her transfer to fire suppression constituted a demotion and, therefore, was an adverse employment action.  Jung points to evidence showing that her hourly wage was reduced, and that her work schedule changed in a way that required her to work (at least on occasion) 24-hour shifts and engage in physically demanding activities. The City counters with evidence that Jung's gross pay actually increased significantly after her transfer—from $89,003.61 to $121,265.90.  (Sautter Decl.  ¶ 43, Ex. 41 at Answer No. 19.)  In addition, the City submits evidence that Jung's base pay decreased from $3,507.01 per two week pay period, to $3,396.01 per pay period, but that in August 2014, her base pay increased to $3,523.06.  (*Id.*)

The Court notes that the evidence required at the prima facie stage of the analysis is minimal.  *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998).  Considering this, and viewing the evidence in the light most favorable to Jung, the Court determines that Jung has submitted sufficient evidence to meet the minimal requirement at the prima facie stage to support a finding that she suffered an adverse employment action when she was transferred to fire suppression.

Jung, however, has not pointed to evidence that links her transfer to a disability. Jung attempts to tie evidence of Ebner's dissatisfaction with Jung's performance to Jung's alleged disabilities. For example, Jung argues that Ebner did not consider Jung to be fit for duty. However, the record demonstrates that Jung was "cleared for return to firefighting duties without restriction" in January 2007. Jung herself maintained that she was fit for duty at the time of her transfer. (Sautter Decl. ¶ 39, Ex. 37.) The record establishes that Jung continued to work as a firefighter for nearly a year and a half, and that the back injury that ultimately caused her to take her current medical leave did not occur until January 2015. Jung has failed to point to record evidence that could lead a reasonable juror to conclude that Jung was transferred in August 2013 because of a disability. Therefore, the Court concludes that Jung fails to establish the third prong of her prima facie case.

### 4.       Disparate Treatment—Legitimate Reason and Pretext

Even if Jung had made out a prima facie case, the City has put forth a legitimate, nondiscriminatory reason for Jung's transfer. In particular, the City submits that Jung was put on notice in 2012 that the elimination of the hazmat position would likely lead to her return to fire suppression. In addition, in March 2013, Jung was told that her job in administration was likely to end when she finished her current assignment. There is also record evidence that staff captains (such as Jung) serve at the will of the Chief, and job

transfers back to fire suppression occur.  (Labor Agreement at § 16.8, Subd. 8.)[7]  The

City has also submitted evidence that it considered Jung a fit for duty firefighter who was

eligible for return to suppression.  Therefore, once the hazmat job was eliminated, there

was no position for Jung in administration and she was transferred to suppression.

Jung argues that the City's reason for her transfer back to fire suppression is a

pretext for disability discrimination.  To avoid summary judgment, Jung must point to

evidence that creates a fact issue as to whether Jung's transfer was pretextual and

supports a reasonable inference that her disability was a determinative factor in her

dismissal.  *Young*, 152 F.3d at 1023; *see also Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d

1328, 1336-37 (8th Cir. 1996) (noting that the focus of inquiry at the summary judgment

stage "always remains on the ultimate question of law:  whether the evidence is sufficient

to create a genuine issue of fact as to whether the employer intentionally discriminated

against the plaintiff because of [the protected characteristic]").

Jung argues that the proffered reason given by the City, namely that her transfer

was prompted by the reorganization of the Fire Inspection Services to the Department of

Regulatory Services is suspicious, particularly because the hazmat position ended two

years prior to her transfer.  In addition, Jung asserts that the City's present assertion that

she was transferred "in the normal course of business differed from the reason given after

her transfer."  (Doc. No. 22 at 30.)  Jung argues that the shifting reason is evidence of

---

[7]     Another employee was transferred back to fire suppression at roughly the same
time as Jung.  (Fruetel Dep. at 34.)

pretext. Jung further argues that she has multiple disabilities and that those involved in her transfer were all aware of her disabilities, yet placed her in a position that they knew she could not perform.

Viewing the record as a whole and the evidence in the light most favorable to Jung, the Court concludes that Jung has not submitted evidence that could lead a reasonable juror to believe that her disability was a determinative factor in her transfer. The record demonstrates that Fruetel believed that Jung was fit for duty at the time of the transfer. Even if at some point, prior to her transfer, Fruetel had reason to question Jung's ability to perform the duties in fire suppression, there was no evidence that any such question remained at the time of transfer or that Jung's alleged disability at all factored into the decision to transfer.

For the above reasons, the Court grants the City's motion for summary judgment on Jung's disability discrimination claim under the MHRA. Therefore, Count II is properly dismissed.

### C.   Disparate Impact

Jung also claims discrimination by way of disparate impact. To establish a prima facie case of disparate impact, Jung must: (1) identify a specific, facially-neutral employment practice; and (2) "statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff to suffer adverse employment action because of his or her membership in a protected group." *Evers v. Alliant Techsys., Inc.*, 241 F.3d 948, 953-54 (8th Cir. 2001). If a plaintiff is able to establish this prima facie case, the burden shifts to the employer to demonstrate that the challenged practice is job

related and consistent with business necessity.  *Id.* at 953.  If the employer successfully establishes a business justification, the plaintiff may still prevail by demonstrating that a comparably effective alternative practice would reduce the adverse impact.  *Id.*

In support, Jung argues that the City has a policy and practice of not reasonably accommodating disabled firefighters.  In particular, Jung asserts that the City's position that all MFD personnel must be able to work in fire suppression (as opposed to considering transfers to other City departments or non-suppression jobs) effectively forces disabled employees out of employment.  Jung also asserts that the blanket policy makes it impossible to return to work with restrictions, or even to get an interactive process to consider accommodations.

The Court concludes that Jung's disparate impact claim fails as a matter of law.  Jung summarily claims that the requirement that all firefighters be fit for duty is a violation of the MHRA.  Even if Jung could assert a prima facie case of disparate impact, the City has demonstrated that the challenged practice is job related and consistent with business necessity.  Being fit for duty is properly regarded as an essential job function of the position as firefighter.  *See, e.g.*, *Cremeens v. City of Montgomery*, Civ. No. 09-409, 2010 WL 3153721, at *7 (M.D. Ala. Aug. 9, 2010).  Jung has submitted no evidence that would call into question the City's policy of requiring its firefighters to be fit for duty or demonstrating an effective alternative.  Therefore, the Court grants the City's motion for summary judgment as to this theory of discrimination.

### D.  Hostile Work Environment

Jung also alleges a cause of action for disability discrimination based on a hostile work environment.  To sustain such a claim, Jung must show that:  (1) she is a member of a protected class; (2) she is subjected to unwelcome harassment; (3) the harassment was because of membership in the protected class; and (4) the harassment affected a term, condition, or privilege of his employment.  *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citation omitted); *Wenigar v. Johnson*, 712 N.W.2d 190, 206 (2006).  Under Eighth Circuit law, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive." *Anderson*, 606 F.3d at 518 (citation omitted).  In addition, "the environment must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed" by Jung.  *Id*. (citation omitted).

In support of her claim of hostile work environment, Jung cites to the following: (1) in 2013, Ebner refused to engage in the interactive process and excluded Jung from training; (2) Jung was transferred to fire suppression where physical demands aggravated existing disabilities; (3) Jung was required to train in extreme heat and the City failed to call Jung's rig on one occasion for a report; and (4) the City failed to accommodate her disabilities.  Jung asserts that there is a nexus among the above alleged harassment and her protected status because her supervisors were aware of her disabilities and the City repeatedly denied Jung her statutory rights as a person with disabilities.  Jung asserts that the constant denial of her rights established a hostile work environment.

In determining whether an environment is sufficiently hostile or abusive to support a claim, the Court looks at the totality of the circumstances, including the frequency of the conduct, the severity or the conduct (whether it is physically threatening or humiliating, or a mere offensive utterance), and whether the conduct unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-788 (1998).  The alleged conduct must be so "severe and pervasive" so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

Here, the Court concludes that, as a matter of law, Jung's allegations of a hostile work environment do not raise an issue of material fact that could lead a reasonable juror to conclude that hostility towards Jung's protected class was severe and pervasive.   In particular, the record evidence would not lead a reasonable juror to believe that the alleged acts of harassment were so severe or pervasive so as to create a hostile or abusive working environment.  Therefore, the Court grants the City's motion for summary judgment as to this theory of discrimination.

## III.    Reprisal Under the MHRA

In Count III, Jung asserts a claim for reprisal under the MHRA.  "A prima facie case of unlawful retaliation requires a showing that the employee engaged in some form of protected activity, that the employee was subject to adverse employment action, and that the adverse action was causally connected to the protected activity."  *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 845 (8th Cir. 2002) (retaliation based on race); *Hill v. Walke*, 737 F.3d 1209, 1218 (8th Cir. 2013).  The *McDonnell Douglas*

burden shifting framework applies. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). Therefore, if a prima facie showing is made, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse action, at which time the burden shifts back to the plaintiff to show the reason was a pretext for discrimination. *Id.*

Jung asserts that she engaged in protected conduct on several occasions, and suffered retaliation.[8] For example, in February 2013, Jung requested accommodations for her disability after injuring her back, and soon thereafter, reported that Ebner chided her for injuring herself. Jung asserts that Ebner retaliated a few weeks later when he told Fruetel that he did not think Jung was fit for duty and communicated that Jung was "reporting off ill" and not performing her duties. Jung also asserts that she reported discrimination on July 29, 2013, and was transferred back to fire suppression on August 1, 2013. In addition, Jung claims that she reported that Ebner treated her differently than others, and later, on August 16, 2013, she reported to Toal that she had been discriminated and retaliated against after requesting an accommodation. Jung asserts that, days later, she was made to engage in training in extreme heat. Finally, Jung claims that she engaged in protected conduct in filing the present lawsuit, and that despite requests for accommodations and reports of discriminatory conduct during the last two years of employment, the City failed to engage in any process to return her to work.

---

[8] Jung points to her reports of alleged discrimination in 2011 and 2012 as a "backdrop" to her more recent reports of discrimination. (Doc. No. 22 at 36.)

The Court concludes that most of Jung's examples of retaliatory conduct do not rise to the level of an adverse employment action that is connected to any protected activity.  Specifically, Jung's allegations that Ebner criticized her for hurting her back, stating that Jung was "reporting off ill" and questioning whether Jung was fit for duty simply do not constitute adverse employment actions.  Therefore, these actions do not support an MHRA reprisal claim.

The Court does, however, conclude that Jung has adequately established a prima facie case of MHRA retaliation based on the July 29, 2013 report, followed by her transfer to fire suppression on August 1, 2013.  The City denies that there is a causal link between these two events and submits that Fruetel, who made the ultimate decision to transfer Jung, was not aware of Jung's July 29, 2013 report of discrimination.  (Fruetel Decl. ¶¶ 3, 4.)  Indeed, if the jury believes that Fruetel was unaware of Jung's report at the time he made the decision to transfer Jung, Jung's MHRA retaliation claim will likely fail.  However, Jung points to record evidence that Fruetel conferred with Penn, who had received a copy of the July 29 report, before making a decision to transfer Jung.  This evidence raises a fact issue as to whether Fruetel was aware of Jung's July 29 report.

Further, despite the City's proffered non-retaliatory justification for Jung's transfer, Jung has pointed to evidence that raises a genuine question of fact on pretext.  Specifically, the timing between Jung's July 29 report and the decision to transfer Jung just days later, along with the fact that Fruetel may have been aware of the report, creates fact issues as to retaliatory intent.   Viewing the record in the light most favorable to Jung, a reasonable juror could conclude that Jung was transferred to fire suppression in

retaliation for the complaint regarding alleged discrimination that she lodged two days earlier.

For the above reasons, the Court concludes that fact questions remain with respect to Jung's claim of MHRA retaliation. Accordingly, the City's motion for summary judgment on Jung's claim for retaliation under the MHRA (Count III) is denied.

## IV.   Section 1983 Claim

In Count IV of her Complaint, Jung alleges a cause of action for a deprivation of rights under color of law, 42 U.S.C. § 1983. Specifically, Jung alleges that retaliatory and discriminatory actions taken by the City after she addressed matters of public concern, such as comments about the City's alleged abuse of overtime and Penn's "stealing from the City" by having a subordinate do her coursework, violated Jung's right to freedom of expression under the First Amendment. (Compl. ¶ 46.)

It is well-established that a governmental entity cannot be held liable under § 1983 on a respondeat superior theory. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Thus, a government body cannot be held liable under § 1983 merely because it employs a tortfeasor. *Id.* at 691-92. For a municipality to be liable under § 1983, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." *Id.* at 694. A formal action, or policy, is one that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City's] officers." *Id.* at 690. In addition to an officially adopted policy, liability may attach to a city for constitutional deprivations that result from "custom," even though the city may not have formally approved the custom. *See id.*

A custom "is demonstrated by:  (1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) [t]he plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation." *Ware v. Jackson County, Mo*., 150 F.3d 873, 880 (8th Cir. 1998) (brackets omitted).

Here, Jung argues that the City, through unlawful policies and practices, violated her First Amendment rights.  (*See* Compl. ¶¶ 126–135.)  Jung, however, fails to identify any City policy pursuant to which her First Amendment rights have been violated.  Jung instead relies on the argument that the City has a custom and practice of retaliation, which can be inferred from the number of repeated acts of retaliation, the manner in which the claims were addressed, and the discipline or failure to discipline personnel implicated in these acts.

Liability may be established through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality "as to constitute a 'custom or usage' with the force of law."  *Monell*, 436 U.S. at 690-91 (citation omitted).  Here, Jung argues that City employees, including Penn, Ebner, and Fruetel have all been "implicated in or found to have engaged in retaliatory conduct."  (Doc. No. 22 at 43.)  In addition, Jung asserts that the City has shown deliberate indifference by its failure to investigate, or timely investigate or discipline employees who engaged in retaliatory or discriminatory conduct.  Jung points to cases involving other MFD employees, wherein

those employees recovered damages or settled their suits involving allegations of retaliation against the City.  These cases, however, are not sufficient to demonstrate the existence of a custom or practice of retaliation so as to support a § 1983 claim against the City.  Here, Jung is dissatisfied with the City's conclusions after the investigations into her various complaints.  That other employees have prevailed on their claims of retaliation does not, in this case, demonstrate a custom for purposes of *Monell*.  Simply put, Jung has not pointed to evidence that the City had a custom that was the "moving force" behind the alleged constitutional violations.  *Monell*, 436 U.S. at 694.  Nor has Jung set forth evidence of a pattern of unconstitutional conduct, deliberate indifference to such conduct, or a custom behind the alleged unconstitutional conduct.  Accordingly, the Court grants summary judgment on Jung's § 1983 claim against the City and Count IV is dismissed.

## V.      Whistleblower Claim

In Count I, Jung asserts that the City has violated the Minnesota Whistleblower Act, Minn. Stat. § 181.932 ("MWA").  The MWA protects an employee from discharge or other retaliation when the "employee . . . in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer. . . ."  Minn. Stat. § 181.932, subd. 1(1).  Minnesota courts apply the same *McDonnell Douglas* burden shifting analysis as noted above for retaliation claims to claims filed under the whistleblower statute.  *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App.

2001).[9]  To establish a prima facie case, Jung must establish:  (1) that she engaged in statutorily-protected conduct; (2) an adverse employment action taken by the City; and (3) a causal connection between the two.  *Id.*   Once established, the City has the burden to show a legitimate, nondiscriminatory reason for the employment action.  *Id.*   Jung then must demonstrate that the City's reason is a pretext for retaliation.  *Id.*

Here, Jung contends that she made the following distinct reports of law violations: (1) on October 13 & 17, 2011, reporting Penn's misuse of power, status, and stealing from the City (the Ethics Complaint); (2) on November 29, 2011, reporting Penn's conduct to the Mayor's office after she learned the investigation found no violation in the Ethics Complaint; (3) on January 10, 2012, reporting that Penn was retaliating against her for making the Ethics Complaint; (4) on June 14, 2012, and again on November 8, 2012, reporting to Ebner that Penn was continuing to retaliate for making the Ethics Complaint; (5) in March 2013, reporting to Toal and Adeniyi that Ebner engaged in discrimination and that Ebner threatened her when he told her he would have to write her up for leaving the building out of uniform; (6) in July 2013, reporting to Toal of a suspected breach of the Internet policy and Ebner harassing her for making the report; and (7) on October 26, 2013, reporting that Ebner was retaliating against her for making the privacy breach report when he participated in the decision to transfer Jung back to fire suppression.

---

[9]     For the purpose of this motion, the City agrees that the statute of limitations for MWA claims is six years.  *See, e.g.*, *Ford v. Minneapolis Pub. Sch.*, 857 N.W.2d 725, 730 (Minn. Ct. App. 2014), *aff'd* 874 N.W.2d 231 (Minn. 2016).  (Doc. No. 29 at 8.)

The MHRA provides that "as to acts declared unfair by sections [of the MHRA], the procedure herein provided shall, while pending, be exclusive."  Minn. Stat. § 363A.04.  Thus, an employee may not seek redress for the same allegedly discriminatory practices on the same facts to support a reprisal claim under both the MHRA and the Whistleblower Act.  *See Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483 (1996) (concluding that the "exclusivity provision of the [MHRA] operates as a bar to the separate maintenance of this claim under the Whistleblower Act").  Here, the City argues that all post July 24, 2012 allegations overlap with Jung's MHRA claims.  A careful review of the claims reveals that Jung's complaint on November 8, 2012 overlaps with her Ethics Complaint and continued claims of retaliation; Jung's March 2013 complaint renewed her November 8, 2012 complaint; and Jung's July 29, 2013 complaint and transfer to fire suppression overlap with her MHRA reprisal claim.  Because these claims overlap with her MHRA claims, they cannot be asserted under the MWA.[10]

As to Jung's remaining alleged MWA claims, even accepting that they constitute actionable reports, Jung must demonstrate that she suffered an adverse employment

---

[10]    In addition, the City argues that Jung's reports after July 2012 are not actionable because they are mere repetitions of prior reports.  (Doc. No. 21 at 22.)  "The mere mention of a suspected violation that the employer already knows about does not constitute a 'report' under the [MWA]."  *Pederson v. BioMed. Applications of Minn.*, 992 F. Supp. 2d 934, 939 (D. Minn. 2014), *aff'd*, 775 F.3d 1049 (8th Cir. 2015).  Jung's alleged reports in September and November 2012 concern issues that were already brought to the attention of the City.  Indeed, these reports referenced allegations made in her Ethics Complaint and January 2012 complaint.  Therefore, Jung cannot be said to have "blown the whistle" in the subsequent complaints.

action that effected a "material change in the terms or conditions" of her employment. *See Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 842 (Minn. App. 2007); *Lee v. Regents of Univ. of Minn.*, 672 N.W.2d 366, 374 (Minn. Ct. App. 2003). "Mere inconvenience without any decrease in title, salary, or benefits, or only minor changes in working conditions does not" equal an adverse employment action. *Leindecker*, 731 N.W.2d at 842 (citation omitted).  Jung claims that each time she made a report of a violation of the law, she was subjected to some form of adverse employment action, such as being monitored more closely at work (i.e., being required to notify the front desk when she left the office or changed her work schedule), excluded from trainings and meetings, required to sign an "Expectations" document, told she was being too loud, and criticized for injuring her back.

The Court concludes that none of the actions described above amount to a material change in Jung's working conditions.  Therefore, they are not actionable under the MWA.  Indeed, the only actions alleged by Jung that could be considered adverse under the MWA are Jung's February 2013 performance review (noting several unsatisfactory areas of Jung's performance) and her transfer back to fire suppression in August 2013. The Court has already determined that the complaint about her transfer is properly considered as part of Jung's MHRA claim (and survives summary judgment as part of her MHRA reprisal claim).  Therefore, the only possible remaining alleged MWA violation relates to Jung's February 2013 performance review.

In February 2013, Jung received a performance review wherein Jung was given "unsatisfactory" ratings by Ebner for dependability/reliability in performing her assigned

duties and for understanding and complying with orders as directed.  The City claims that
the performance review occurred more than one year after any reported discrimination or
retaliation by Jung.  In addition, the City points out that the performance review occurred
after many intervening events, including Jung's admitted attendance issues and failure to
perform the necessary number of required inspections.  Thus, the City argues that, as a
matter of law, there is no causal connection between any report and the performance
review.

The Court agrees.  While the record shows that in the fall of 2012, Jung e-mailed
Ebner complaining of continued retaliation that stemmed from her January 2012
complaint, the investigation of the January 2012 claims was completed in February 2012
and found the claims to be unsubstantiated.  Jung did not initiate any new formal
complaint after that and before her February 2013 performance review.  Her e-mails do
not constitute a good faith report, as they reiterate the allegations made in January 2012.
Moreover, they occurred several months before her performance review.  And more
importantly, as the City rightly points out, there were many intervening events.  Viewing
the record in the light most favorable to Jung, no reasonable juror could conclude that
Jung's February 2013 performance review was given in retaliation for any statutorily-
protected conduct.

For the above reasons, the Court grants the City's motion for summary judgment
on Jung's MWA claim.  Count I is properly dismissed.

## VI.   Official Immunity

The City argues that it is entitled to vicarious official immunity for each of the alleged adverse employment actions (the transfer to fire suppression and performance review) because they were discretionary actions and Jung has not submitted evidence that the actions were taken willfully or maliciously.

Under Minnesota law, public officials are automatically entitled to official immunity from state-law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong. *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn. 1990); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988). A government employer is entitled to vicarious official immunity of its employee's actions are entitled to official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 317 (Minn. 1998). Malice, in the official immunity context, means intentionally committing an act that the official has reason to believe is prohibited. *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). This is an objective inquiry that examines the legal reasonableness of an official's actions. *Id.* at 571.

Here, viewing the record in the light most favorable to Jung, the Court finds that Jung has submitted evidence sufficient to raise a genuine issue of material fact in regard to her MHRA retaliation claim. Should a jury find that the City retaliated against Jung, the jury could also reasonably conclude that the retaliation was based on actions that were intentionally committed with the knowledge that they were prohibited. Therefore, the City is not entitled to vicarious qualified immunity.

## CONCLUSION

For the reasons discussed above, the Court concludes that fact issues remain as to Jung's MHRA reprisal claim in this action.  Thus, the City's motion for summary judgment on that claim is properly denied.  The Court cautions Jung, however, that the denial of summary judgment on this claim is not tantamount to victory at trial.  While not sufficient to warrant summary judgment, it appears to the Court that certain evidence in the record will make recovery at trial difficult for Jung.  The Court notes that, on the record before it, the best interests of the parties will likely be served by a negotiated resolution to this dispute.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED** that the City's Motion for Summary Judgment (Doc. No. [16]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      The motion is denied as to Count III; and

2.      The motion is granted as to Counts I, II, and IV.  Counts I, II, and IV are **DISMISSED WITH PREJUDICE**.

Dated:  May 10, 2016                                 s/Donovan W. Frank
                                                     DONOVAN W. FRANK
                                                     United States District Judge